Slip Op. 08-138

# UNITED STATES COURT OF INTERNATIONAL TRADE

ALLIED PACIFIC FOOD (DALIAN) CO.
LTD., ALLIED PACIFIC (H.K.) CO., LTD.,
KING ROYAL INVESTMENTS, LTD.,
ALLIED PACIFIC AQUATIC PRODUCTS
(ZHANJIANG) CO. LTD., ALLIED PACIFIC
AQUATIC PRODUCTS (ZHONGSHAN) CO.
LTD. and YELIN ENTERPRISE CO., HONG
KONG,

      Plaintiffs,

      v.

UNITED STATES,

      Defendant.

Before:  Timothy C. Stanceu, Judge

Consol. Court No. 05-00056

## OPINION AND ORDER

[Remanding an antidumping remand redetermination for further proceedings during which the United States Department of Commerce must determine new surrogate values for raw shrimp and labor, affecting the normal value of imported merchandise]

Dated: December 22, 2008

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Mark E. Pardo*, *Ned H. Marshak*, *Paul G. Figueroa*, and *William F. Marshall*) for plaintiffs Allied Pacific Food (Dalian) Co. Ltd., *et al.*

*Akin Gump Strauss Hauer & Feld LLP* (*Spencer S. Griffith*, *Lisa W. Ross*, and *Margaret C. Marsh*) for plaintiff Yelin Enterprise Co., Hong Kong.

*Gregory G. Katsas*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); *Mykhaylo A. Gryzlov*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stanceu, Judge: This case arose from plaintiffs' contesting the final, and amended final, less-than-fair-value determination that the International Trade Administration of the U.S. Department of Commerce ("Commerce" or the "Department") issued in an antidumping duty investigation on certain frozen shrimp from the People's Republic of China ("China" or the "PRC"). *See Notice of Final Determination of Sales at Less Than Fair Value: for Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 70,997 (Dec. 8, 2004) ("*Final Determination*"); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp From the People's Republic of China*, 70 Fed. Reg. 5149 (Feb. 1, 2005) ("*Am. Final Determination and Order*"). Before the court is the Department's redetermination issued in response to a remand ordered by the court in *Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 30 CIT __, 435 F. Supp. 2d 1295 (2006) ("*Allied Pacific I*"). *See* Final Results of Redetermination Pursuant to Court Remand (Oct. 27, 2006) ("Remand Redetermination"). Also before the court are plaintiffs' comments on the Remand Redetermination, defendant's response, and three motions pertaining to the redetermination.

Defendant United States moves for another remand order, under which Commerce voluntarily would reconsider and further explain, but not necessarily change, the decision Commerce made in the Remand Redetermination on one of the two major issues addressed by the court's opinion and order in *Allied Pacific I*. Def.'s Mot. for Voluntary Remand 1-3. That issue is the calculation by Commerce of a surrogate value for raw, head-on, shell-on shrimp, which is the most significant raw material used in the production of the imported merchandise, certain frozen warmwater shrimp from China, that was the subject of the antidumping duty

investigation ("subject merchandise") resulting in this litigation. *See id*. The other major issue in this litigation is the calculation of a surrogate value for the labor used in producing the subject merchandise. Defendant's motion and proposed voluntary remand order do not propose to change the surrogate labor rate set forth in the Remand Redetermination. *See id*. Both surrogate values are used in determining, for antidumping duty purposes, the normal value of the subject merchandise.

Plaintiffs Allied Pacific Food (Dalian) Co. Ltd., Allied Pacific (H.K.) Co., Ltd., King Royal Investments, Ltd., Allied Pacific Aquatic Products (Zhanjiang) Co. Ltd., Allied Pacific Aquatic Products (Zhongshan) Co. Ltd. (collectively "Allied Pacific") and Yelin Enterprise Co., Hong Kong ("Yelin") oppose defendant's motion for a voluntary remand. Allied Pacific and Yelin have filed separate counter-motions for remands, each of which advocates a remand order under which the court would direct Commerce to redetermine, in specific ways, the surrogate values for raw, head-on, shell-on shrimp and for labor. Pl.'s Opp'n to Def.'s Proposed Voluntary Remand and Counter Mot. for Remand 1-10 ("Allied Pacific Opp'n to Voluntary Remand"); Pl. Yelin's Opp'n to Def.'s Mot. for Voluntary Remand 2-5 ("Yelin Opp'n to Voluntary Remand").

*Allied Pacific I* arose from plaintiffs' contesting the final determination ("Final Determination") and amended final determination ("Amended Final Determination") and moving for judgment on the agency record according to USCIT Rule 56.2. In their motion, plaintiffs claimed that Commerce failed to adhere to the statutory requirement to value raw shrimp and labor according to the best available information. In *Allied Pacific I*, the court ordered Commerce to redetermine the surrogate values for raw, head-on, shell-on shrimp and for the

labor rate. *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1323. Plaintiffs argue that the

Remand Redetermination does not comply with the court's remand order in *Allied Pacific I* and

that the findings Commerce relied upon in the Remand Redetermination are unsupported by

substantial record evidence. *See* Pl.'s Comments on the Department's Remand

Determination 1-49 ("Allied Pacific Comments"); Comments of Yelin Enterprise Co., Hong

Kong on Remand Determination 1-25 ("Yelin Comments"). Regarding the surrogate labor rate,

plaintiffs reiterate specific arguments they made in challenging that rate, including the argument

that Commerce did not provide an adequate explanation for the finding that its method produced

a more accurate result than plaintiffs' preferred alternative. *See* Allied Pacific Comments 45-47;

Yelin Comments 25. Allied Pacific also requests that the court instruct Commerce to adjust the

dumping margin applied to Section A respondents based on the final rates affirmed by the court.

Allied Pacific Comments 49.

Defendant's proposed voluntary remand order would direct Commerce either to

redetermine the surrogate value for raw, head-on, shell-on shrimp according to a different set of

data than that used in the Remand Redetermination or, if Commerce retains its earlier method of

valuing the raw shrimp, to provide the court with its reasons for concluding that this method

produces a reliable result. Def.'s Mot. for Voluntary Remand 2-4. Allied Pacific and Yelin urge

the court not to adopt defendant's proposed remand order, and each moves for a more specific

remand order that would direct Commerce to value the raw shrimp according to a different set of

data that plaintiffs consider to be the best available information on the record, or, alternatively, to

explain why that set of data is not appropriate. Allied Pacific Opp'n to Voluntary Remand 1-9;

Yelin Opp'n to Voluntary Remand 2-4. Plaintiffs also argue that the court should direct

Commerce to change its method of determining a surrogate labor rate rather than accept the more minor revision to the Department's labor rate calculation that Commerce effected in the Remand Redetermination. Allied Pacific Opp.'n Voluntary Remand 10; Yelin Opp'n to Voluntary Remand 4-5.

For the reasons discussed in this Opinion and Order, the court concludes that the Department's new surrogate value for raw shrimp does not comply with the court's decision in *Allied Pacific I*. The court also concludes that defendant's proposed voluntary remand order, although addressing some of the shortcomings in the Final Determination and Amended Final Determination, is not in every respect a satisfactory resolution of the issues this case presents regarding the raw shrimp surrogate value. Further, the remand order the court is issuing in this case differs from the proposed remand orders sought in plaintiffs' counter-motions. Concerning the labor wage rate issue, the court concludes that Commerce's redetermined surrogate value for labor was not determined in accordance with law because the regulation and methodology under which the surrogate labor rate was calculated are inconsistent with the antidumping statute. Finally, the court concludes that plaintiff Allied Pacific lacks standing to challenge the dumping margin applied to Section A respondents.

Exercising its jurisdiction under 28 U.S.C. § 1581(c) (2000), the court orders Commerce to file a remand redetermination in which it determines new surrogate values for raw shrimp and labor according to specific directions set forth in this Opinion and Order.

**I. BACKGROUND**

The procedural background of the initial phase of this case is presented in the court's opinion and order in *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1298-1308. That

background discussion is supplemented herein to recount the various events occurring since

*Allied Pacific I* was decided on June 12, 2006.

In its Remand Redetermination, issued on October 27, 2006, Commerce lowered the base

surrogate value for raw, head-on, shell-on shrimp from the originally-determined $5.97 per

kilogram to $5.07 per kilogram and lowered the labor rate from $0.93 to $0.85 per hour.

Remand Redetermination 2, 22-23; *Issues and Decision Memorandum for the Antidumping Duty*

*Investigation of Certain Frozen and Canned Warmwater Shrimp from the People's Republic of*

*China* 18 (Nov. 29, 2004) (Admin. R. Doc. No. 814) ("*Decision Mem.*").  On remand, Commerce

applied these revised surrogate values in recalculating the dumping margins for plaintiffs Allied

Pacific and Yelin, lowering Allied Pacific's margin from 80.19% to 55.56% and Yelin's margin

from 82.27% to 56.37%.  Remand Redetermination 85; *Am. Final Determination and Order*, 70

Fed. Reg. at 5151.  Following the filing of comments on the Remand Redetermination,

defendant, on February 13, 2007, filed its motion for a voluntary remand.  Allied Pacific and

Yelin filed their opposition to defendant's voluntary remand motion and their counter-motions on

March 5, 2007.[1]

---

[1] The parties made further filings after these motions.  On October 11, 2007, Allied
Pacific filed a letter requesting that the court take judicial notice that Commerce, in the final
results of the first administrative review of the antidumping duty order on certain warmwater
shrimp from China, valued the raw shrimp input according to Indonesian shrimp prices taken
from a study published by the Network of Aquaculture Centres in Asia Pacific ("NACA").
*Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to the Clerk of the Court*
(Oct. 11, 2007) (citing *Certain Frozen Warmwater Shrimp From the People's Republic of China:*
*Notice of Final Results and Recission, in Part, of 2004/2006 Antidumping Duty Administrative*
*and New Shipper Reviews*, 72 Fed. Reg. 52,049 (Sept. 12, 2007)).  Defendant filed a brief in
response to the letter on October 25, 2007, arguing that plaintiff's letter was unauthorized by the
USCIT Rules because it was procedurally irregular and was filed without leave of the court.
Def.'s Resp. to Allied Pacific's Unauthorized Letter 3.  Defendant also argued that Allied
                                                                                    (continued...)

A.  The Department's Recalculation of the Surrogate Value for Raw, Head-On, Shell-On Shrimp

Commerce, during the investigation and again on remand, used India as the surrogate

country in valuing the various factors of production associated with the subject merchandise,

other than labor.  *See* Remand Redetermination 4-5; *see also* 19 U.S.C. § 1677b(c)(1) (2000)

(requiring generally that "the valuation of the factors of production shall be based on the best

available information regarding the values of such factors in a market economy country or

countries considered to be appropriate by the administering authority").  To determine the

surrogate value for raw, head-on, shell-on shrimp in the Remand Redetermination, Commerce

used data on raw seafood material purchases that were contained in the financial statement of an

Indian seafood producer, Nekkanti Sea Foods Ltd. ("Nekkanti"), as it had in the Final

Determination.  Remand Redetermination 22-23.  The Nekkanti financial statement had been

submitted for the record in the investigation by the petitioners.  *See Letter from Dewey Ballantine*

*LLP to Sec'y of Commerce* at 3, Attach. 1 (May 21, 2004) ("*Petitioners' Surrogate Value*

*Submission*") (Admin. R. Doc. No. 269).  In the antidumping duty investigation, and again in the

Remand Redetermination, Commerce chose the Nekkanti financial statement data over various

other sets of data in valuing the raw shrimp input.  *See* Remand Redetermination 8-9, 22-23;

*Decision Mem.* 8-16.  As it had in the investigation, Commerce concluded in the Remand

Redetermination that the Nekkanti financial statement data were superior to all other data sets on

the record and therefore constituted, for purposes of 19 U.S.C. § 1677b(c)(1), the "best available

---

[1](...continued)
Pacific's letter is irrelevant and illogical because it pertains to the choice of surrogate data on the
record of the administrative review, not the investigation.  *Id*. at 4-6.  The remand that the court
is ordering in this case makes it unnecessary for the court to address the arguments the parties
have made in these two submissions.

information" that could be used in determining a surrogate value for raw shrimp. Remand

Redetermination 8-22; *Decision Mem.* at 8-16; *see* 19 U.S.C. § 1677b(c)(1).

In the Remand Redetermination, Commerce lowered the original $5.97 per-kilogram base

surrogate value to the new, $5.07 base surrogate value by making an adjustment in its calculation

to exclude those of Nekkanti's shrimp purchases that were purchases of processed shrimp, as

opposed to purchases of raw, head-on, shell-on shrimp. Remand Redetermination 2, 22. With

respect to the $5.97 base value, the court concluded in *Allied Pacific I* that the record lacked

substantial evidence to establish that Nekkanti's shrimp purchases were confined to raw, head-

on, shell-on shrimp. *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1311-12. Commerce

explained that "upon careful re-examination, we agree with the Court's observation that this

value includes processed shrimp." Remand Redetermination 9. Commerce went on to state that

> [c]onsistent with the Court's order, because Nekkanti's financial statement is
> being used to value the main raw material input used in the production of subject
> merchandise, and because it is possible to exclude Nekkanti's purchases of
> processed (*i.e.*, headless, peeled, deveined, etc.) shrimp, the Department has done
> so in order to achieve a more accurate surrogate value that is more specific to
> Allied Pacific['s] and Yelin's raw, unprocessed shrimp inputs.

*Id.* at 9-10. From data on Nekkanti's purchases that were submitted in the parallel antidumping

duty investigation on certain warmwater shrimp from India, Commerce estimated that Nekkanti's

raw material consumption during that period of investigation (which was October 1, 2002

through September 30, 2003) was 23.99% processed shrimp by quantity and 32.14% processed

shrimp by value. *Id*. at 18; *see also Notice of Final Determination of Sales at Less Than Fair

Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned

Warmwater Shrimp From India*, 69 Fed. Reg. 76,916, 76,916 (Dec. 23, 2004). Commerce

concluded that these purchases were a reasonable basis for estimating Nekkanti's raw material consumption during the 2002-2003 fiscal year, April 2002 through March 2003, which was the fiscal year reported in the Nekkanti financial statement. Remand Redetermination 18. Commerce stated in the Remand Redetermination that it "adjusted Nekkanti's 2002-2003 consumption of raw shrimp by reducing the *quantity* of Nekkanti's raw materials consumed by 23.99 percent and reducing the *value* of Nekkanti's raw materials consumed by 32.14 percent." *Id.* at 22.

Because the Nekkanti financial statement data are not specific as to count size, Commerce retained in the Remand Redetermination the method it had used in the Final Determination to convert the single value obtained from the Nekkanti financial statement data to individual values representing various categories of shrimp count sizes reported by Allied Pacific and Yelin. *Id*. As discussed in *Allied Pacific I*, that method derived standard count size ranges from the information of Urner Barry, a publisher of pricing and other market information for various food industries, including the seafood industry, and correlated the count size ranges of Allied Pacific and Yelin to the count size ranges it had derived. *See Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1308. As it had in the original investigation, Commerce in the Remand Redetermination assigned the base Nekkanti value for raw, unprocessed shrimp (as revised downward from $5.97 per kilogram to $5.07 per kilogram) to the weighted average count size range of 31 to 40 shrimp per pound,[2] calculated the average price differential between count size

---

[2] The count size ranges that Commerce obtained using the Urner Barry data were expressed in shrimp per pound, not in shrimp per kilogram as incorrectly stated in *Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 30 CIT __, 435 F. Supp. 2d 1295 (2006) ("*Allied Pacific I*"). *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1308, 1313 & n. 7 (with respect to

(continued...)

ranges, and adjusted the Nekkanti base price by 13.24% for successive count-size ranges.

Remand Redetermination 22-24.

As discussed in detail in *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1303,

respondents placed on the record of the investigation several data sets of shrimp prices in India.

One set of data consisted of pricing information in issuances ("circulars") distributed in the

surrogate country, India, by the Seafood Exporters Association of India ("SEAI") listing count-

size-specific prices for raw, head-on, shell-on shrimp from two Indian shrimp producing regions,

Andhra Pradesh and Tamil Nadu ("SEAI data"). The SEAI data included prices for the dates of

June 6, June 21, July 26, and August 9, 2003 for Andhra Pradesh and prices for the period April

through September 2003 for Tamil Nadu. *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d

at 1303. The circulars were submitted for the record of the investigation by Allied Pacific and

Yelin. *See Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y of

Commerce* Ex. 3 (May 21, 2004) (Admin. R. Doc. No. 267) ("*Allied Pacific First Surrogate

Value Submission*"). In addition, plaintiffs submitted data from *World Shrimp Farming 2003,

Shrimp News International, Number 16* that lists Andhra Pradesh and Tamil Nadu as ranking

first and fifth, respectively, among nine Indian states in production of farm-raised shrimp for

2002. *Id*. In their motions for remand orders, plaintiffs urge the court to direct Commerce to use

the SEAI data to value the raw shrimp input.

Also on the record of the investigation are data sets that Allied Pacific and Yelin

submitted as alternates during the investigation after petitioners opposed the use of the SEAI data

---

[2](...continued)
31-40 count size range).

for the calculation of a raw shrimp surrogate value. *See Letter from Grunfeld, Desiderio,*

*Lebowitz, Silverman & Klestadt LLP to Sec'y of Commerce* 2 (Sept. 8, 2004) (Admin. R. Doc.

No. 709) ("*Allied Pacific Second Surrogate Value Submission*"). Plaintiffs submitted historical

prices for raw, head-on shrimp that were published by the Aquaculture Certification Council, Inc.

in India ("ACC data"). *Id*. at Ex. 3. Plaintiffs also provided publicly available, "ranged"

purchase prices that two Indian companies, Devi Sea Foods, Ltd. ("Devi") and Nekkanti, had

reported as actual prices paid for raw shrimp ("Devi and Nekkanti ranged data" or "Ranged

Data") in their roles as respondents in the parallel antidumping investigation of certain

warmwater shrimp from India. *Id*. at Attachs. 1-2. The data on these reported sales were

modified for public consumption pursuant to the Department's regulations, which allow a

respondent to summarize its data by grouping ("ranging") the data to within ten percent of the

actual numerical figures. *See* 19 C.F.R. § 351.304(c) (2004).

B. The Department's Recalculation of the Surrogate Value for the Labor Rate

The Remand Redetermination recalculated the surrogate labor wage rate it applied in the

Final Determination, lowering the rate from $0.93 per hour to $0.85 per hour. Rejecting

plaintiffs' argument that the Department's regression analysis methodology, which the

Department applied under its regulation, 19 C.F.R. § 351.408(c)(3) (2004), is contrary to law, the

Remand Redetermination concludes that the regulation and methodology are consistent with all

statutory requirements. Remand Redetermination 35-46. The Remand Redetermination also

concludes that plaintiffs' alternative of using the country-wide labor wage rate for India would be

inconsistent with the regulation and would produce a result less accurate than that resulting from

the Department's regression analysis. *Id*. at 78-80.

Under the Department's regulation, the surrogate value of labor is not derived in the same manner as the surrogate values of other factors of production. *See* 19 C.F.R. § 351.408(c)(2)-(c)(3). With respect to the surrogate value for labor, the regulation provides that

> [f]or labor, the Secretary will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries. The Secretary will calculate the wage rate to be applied in nonmarket economy proceedings each year. The calculation will be based on current data, and will be made available to the public.

*Id*. § 351.408(c)(3). As the Department describes its method in the Remand Redetermination, "[f]irst, the Department uses a regression analysis to estimate the linear relationship between GNI [*i.e.*, gross national income,] and hourly wage rates from a sufficient number of market economy countries." Remand Redetermination 76. "Second, the Department applies the GNI for each NME [*i.e.*, non-market economy,] to the results of the regression and the GNI data to estimate the hourly wage rates for each non market economy country." *Id.* "The result is the expected non market economy country labor/wage rate for each NME country." *Id.* As required by the regulation, Commerce determines non-market economy labor rates on an annual basis. *Id*. at 37.

Commerce relied on four different data sets in performing its regression analysis: (1) country-specific wage rate data from the International Labour Organization ("ILO") for fifty-six countries;[3] (2) country-specific consumer price index ("CPI") data from the International Monetary Fund ("IMF"); (3) exchange rate data from the IMF; and (4) country-specific

---

[3] Commerce uses wage rate data that pertain to all reported industries and both genders in each country. *See* Final Results of Redetermination Pursuant to Court Remand 39 (Oct. 27, 2006) ("Remand Redetermination").

per-capita GNI data from the World Bank.[4]  *Id.* at 38.  The information contained in the data sets

is not contemporaneous with the period of investigation.  "There is normally a two-year interval

between the current year and the most recent reporting year of the data required for [the

Department's] methodology due to the practices of the respective data sources."  *Id*. at 37.  The

ILO wage data are inflation-adjusted to correspond to the same "Base Year" as the other data

sets; the "Base Year" usually precedes the period of investigation by two years.  *Id*. at 37-41.

Specifically, before conducting the regression analysis, Commerce converts the ILO wage rate

data to hourly wages, adjusts the wage data using CPI data to reflect the relevant Base Year, and

converts the data to U.S. dollars using the exchange rate data from the relevant Base Year.  *Id*.

at 38, 40-41.  Commerce then regresses this adjusted hourly wage rate data from fifty-six market

economy countries against the per-capita GNI data from the same countries and arrives at the

following equation:

Wage of the Non-Market Economy Country =
Y-intercept[5] + X-coefficient[6] * GNI of the Non-Market Economy Country

*See id*. at 41.  Commerce uses this equation to estimate hourly wage rates in all non-market

economy countries, including China.  *See id*. at 76.

---

[4] According to Commerce, the World Bank equates gross national income per-capita to gross national product per-capita and considers it to reflect the average income of a country's citizens.  *Id*. at 41.

[5] The Y-intercept is the point on the Y-axis where the line estimated by the regression analysis intercepts the Y-axis.  *Id*.

[6] The X-coefficient describes the slope of the line estimated by the regression analysis.  *Id*.

In the Remand Redetermination, Commerce made various changes to address what it considered to be errors in its methodology; the cumulative effect of those changes lowered the calculated labor rate from $0.93 to $0.85 per-hour. *Decision Mem*. at 18; Remand Redetermination 2. Commerce found that in the investigation it had failed to use the most current data for its regression analysis, having inadvertently used computer spreadsheet files from its 2003 calculation rather than data available in 2004. Remand Redetermination 42. Commerce also discovered that the more recent data set it intended to use, the October 2004 wage rate data set, "cannot be used for the expected wage rate calculation because it contains at least five types of errors, each of which represents a departure from the Department's methodology for the calculation of expected NME wage rates." *Id*. at 44. To correct for these errors, Commerce, in the Remand Redetermination, used data available as of December 2004. *Id*. at 45-46. That data set, however, contained only fifty-four countries instead of the usual fifty-six; Commerce deleted the data from two of the fifty-six countries, Algeria and Zimbabwe, considering it to be incomplete. *Id*. at 46. Commerce also made adjustments to the data set to correct other errors, which adjustments are not specifically challenged in this case. *Id*. Commerce determined that the regression analysis it performed using this data set "enables the Department to determine in an accurate, fair, and predictable manner, the labor wage rate of a market economy country at a comparable level of development," and stated that it considers "the data set used here to be the best available reliable data." *Id*. at 79.

In the Remand Redetermination, Commerce rejected several alternative methods of determining the surrogate value of the labor input. Commerce rejected valuing the labor input using the wage rate of a single country selected as comparable, because it "is not required by

statute and would violate the Department's regulation." *Id*. Commerce concluded that "such a method would not appear to offer greater accuracy," particularly because of variation in the wage rates of economically comparable countries. *Id*. at 77, 79-80. Commerce also rejected the use of alternative data sets in the agency's regression analysis. *Id*. at 78-84. Citing its wide discretion in determining what constitutes the best available information, Commerce rejected a smaller set of countries with economies comparable to India, explaining that "the basket of countries need not be limited to those with similar per-capita GDP." *Id.* at 78. Commerce also turned down plaintiffs' request that "the Department consider increasing the number of countries in the analysis . . . if it continues to employ the current regression analysis." *Id.* at 80-84. Commerce reasoned that, because the main benefits of the regression-based wage rate calculation are its accuracy, predictability, and fairness to all parties, "extreme changes in the dataset of countries from one year to the next, or from one case to the next, without the benefit of public comment or the opportunity for adequate analysis of the data available, may result in decreased predictability and fairness for all parties before the Department, and would undermine the purpose of its regulation." *Id*. at 80. Commerce found its data set to be sufficiently broad to render an accurate wage rate and considered the proposed alteration to add more countries to be less appropriate because it would not provide all interested parties with the opportunity to comment. *Id*. at 81, 84.

## II. DISCUSSION

The court will uphold the Department's Remand Redetermination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). "Substantial evidence is more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "This is something less than the weight

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's finding from being supported by substantial

evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

A.  On Remand, Commerce Must Redetermine the Surrogate Value of Raw, Head-On, Shell-On
    Shrimp Using Record Information Other than the Nekkanti Financial Statement Data

In their comments on the Remand Redetermination, plaintiffs again object to the

Department's choice, from among the four available data sets, of the Nekkanti financial

statement data for use in calculating the surrogate value of raw, head-on, shell-on shrimp.

Plaintiffs argue that the Department's conclusion that this data set constitutes the best available

information as required by 19 U.S.C. § 1677b(c)(1) is unreasonable and not supported by

substantial record evidence. *See* Allied Pacific Comments 5; Yelin Comments 8-9, 22-23.

Plaintiffs contend that the revised base surrogate value of $5.07 per-kilogram derived from the

Nekkanti financial statement data is aberrational because it is substantially higher than values for

raw, head-on, shell-on shrimp determined according to the other data sets on the record. Allied

Pacific Comments 4; Yelin Comments 18-21. They also argue that the Nekkanti financial

statement is not the best available information under the Department's own criteria and that the

methodology Commerce used to process the data in the Remand Redetermination is flawed.

Allied Pacific Comments 6-18, 28-40; Yelin Comments 7-25.

In the Remand Redetermination, Commerce concluded that "[a]lthough none of the

surrogate value sources available to the Department perfectly satisfied the Department's criteria

of public availability, contemporaneity, broad market averages, specificity and reliability, the [Nekkanti financial statement data] satisfied the Department's criteria better than the other surrogate value sources." Remand Redetermination 57. Defendant, in its brief commenting on the Remand Redetermination, argued in support of the Department's determination that the Nekkanti financial statement data constitutes the best available information on the record. Def.'s Resp. to Pl.'s Comments upon the Remand Redetermination 4-23 ("Def.'s Remand Resp."). Subsequent to oral argument, however, defendant filed its motion for voluntary remand, stating that Commerce would "reconsider its selection of surrogate value sources for raw, head-on, shell-on shrimp." Def.'s Mot. for Voluntary Remand 2. Plaintiffs oppose such a voluntary remand and instead seek a remand that generally would require Commerce to value the raw shrimp input according to the SEAI data. Allied Pacific moves for a remand "instruct[ing] Commerce to use the SEAI prices unless Commerce can demonstrate based on specific record evidence . . . that the SEAI prices have a deficiency or distortion." Allied Pacific Opp'n to Voluntary Remand 9; *see also* Yelin Opp'n to Voluntary Remand 3-4.

Congress has vested Commerce with considerable discretion in selecting the "best available information" for use in valuing factors of production. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("*Nation Ford*"). "'[T]he process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise.'" *Id*. (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed. Cir. 1997)). "While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors in the application of those guidelines." *Id*. Nevertheless, the Department's exercise of discretion to select the "best

available information" pursuant to 19 U.S.C. § 1677b(c)(1) must be guided by the broader purpose of antidumping law. "[A]n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible . . . ." *See Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1063 (2008); *see also Lasko Metal Prod., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994) ("*Lasko*") (stating that "there is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible").

The record does not contain substantial evidence to support findings of fact from which Commerce may conclude that the Nekkanti financial statement data constitute the "best available information" under 19 U.S.C. § 1677b(c)(1). Commerce, in the Remand Redetermination, explains that in selecting the best available information, Commerce "prefers to use surrogate values that are publicly available, broad market averages, contemporaneous with the POI [*i.e.*, period of investigation], specific to the input in question, and exclusive of taxes and exports." Remand Redetermination 5. Commerce rejected the Devi and Nekkanti ranged data, SEAI data, and ACC data principally for a claimed lack of "reliability," a criterion that Commerce "also considers." *Id*. at 6-7. "The Department determined that the prices from SEAI, ACC and Ranged Data on the record were unreliable as each suffered from fundamental problems that called into question the representativeness of its prices." *Id*. at 7.

The court concludes that Commerce's finding that the financial statement data are more reliable than certain other data on the record (specifically, as discussed below, the Devi ranged data and the SEAI data) is not supported by substantial evidence on the record. Although the court concludes that Commerce's finding on remand that the Nekkanti financial statement data

do not include data on seafood other than shrimp is supported by substantial evidence, and although Commerce has made an adjustment to its calculated base value to address an important deficiency in the financial statement, *i.e.*, that the data therein pertain to raw material that includes processed shrimp, the record lacks substantial evidence to support a general finding that the financial statement data constitute the best available information on the record with which to value unprocessed shrimp. An unresolved deficiency exists because the Nekkanti financial statement data, unlike competing data sets, do not pertain to any specific shrimp count size, and because the method Commerce used to address this deficiency relies on an unsupported inference rather than on findings of fact supported by record evidence.

1.  Commerce's Finding on Remand that the Financial Statement Data Do Not Include Purchases of Raw Material Other Than Shrimp Is Supported by Substantial Evidence

In *Allied Pacific I*, the court concluded that Commerce did not make a finding that the Nekkanti financial statement data excluded raw material purchases of seafood other than shrimp. *See Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1309-11. Commerce, in the Remand Redetermination, made such a finding, stating that "[i]n accordance with the Court's remand order, the Department thoroughly reviewed the record of the investigation, including all items in Nekkanti's 2002-2003 audited financial statement from which the raw shrimp surrogate value was derived." Remand Redetermination 18-19. Commerce then sets forth the record evidence that supports its finding that the Nekkanti financial statement data are confined to purchases of shrimp. *Id.* at 19-21.

Upon review of the Department's discussion in the Remand Redetermination and of the relevant documents on the record, the court concludes that substantial record evidence supports

the finding that the purchasing data in the financial statement pertain only to shrimp and not to other seafood. Within the entire body of the record evidence, the court finds particularly significant the listing, in the same table as the raw material data used by Commerce, a "Sale Quantity" of 3,785 metric tons of "Processed Shrimp" for the fiscal year with a "Sale Value" for "Processed Shrimp" of 1,641,654,771 Rs. and the absence of any reference to production of seafood products other than shrimp. *See Nekkanti Sea Foods Ltd. 19th Annual Report 2002-2003* 23 (2003) *in Petitioners' Surrogate Value Submission* Attach. 1. Opening and closing inventory of finished product is expressed only for shrimp. *Id*. The summary information at the beginning of the financial statement discloses exports of "about 3785" metric tons of "Marine Products," valued at "around 164 Crores,"[7] which corresponds with the "Sale Quantity" and "Sale Value" data for processed shrimp, and also discloses that the company had production and sales of prawn seed. *Id*. at 2, 23.

Contrary to plaintiffs' argument in their comments on the Remand Redetermination, the listing on page twenty-five of the financial statement of the generic name of one of the company's principal products as "Sea Foods/Frozen Shrimp" does not unambiguously signify that the data in question include non-shrimp products, particularly in light of the specific references to "Processed Shrimp" discussed above. *See* Allied Pacific Comments 8-9; Yelin Comments 4 n.3. Plaintiffs also direct the court's attention to record information found in Nekkanti's questionnaire responses in the parallel Indian shrimp antidumping investigation in which Nekkanti disclosed processing of non-shrimp seafood during the period of investigation,

---

[7] A crore, in India, refers to a quantity of ten million. *The Random House College Dictionary* 318 (Revised ed. 1980). Thus, a crore of rupees is ten million rupees.

October 1, 2002 through September 30, 2003, including "deep sea lobster," "cuttle fish," and

"fish." Allied Pacific Comments 9-10 (citing *Nekkanti Sea Foods Ltd. Section D Resp.* Ex. D-1

(Apr. 15, 2004) *in Allied Pacific Second Surrogate Value Submission* Attach. 1; *Supplemental*

*Resp. to Section D of Nekkanti Sea Foods Ltd.* 16, Ex. SD-12 (July 12, 2004) *in Allied Pacific*

*Second Surrogate Value Submission* Attach. 1); Yelin Comments 5 (citing *Nekkanti Sea Foods*

*Ltd. Section D Resp.* at Ex. D-1 *in Allied Pacific Second Surrogate Value Submission* Attach. 1).

According to ranged data in the questionnaire responses, shrimp accounted for 97.2% of

Nekkanti's total processing during the period of investigation, while other products accounted for

only 2.8% of that total.[8] This record evidence does not suffice to negate Commerce's finding

that Nekkanti did not process seafood other than shrimp during the time period covered by the

financial statement, *i.e.*, from April 1, 2002 to March 31, 2003. *Nekkanti Sea Foods Ltd. 19th*

*Annual Report 2002-2003* at 2 *in Petitioners' Surrogate Value Submission* Attach. 1. As

discussed above, Commerce's analysis of the Nekkanti financial statement concludes that

Nekkanti produced and sold only shrimp during this period. The information in Nekkanti's

questionnaire responses does not necessarily contradict this analysis; Nekkanti could have

processed this small amount of other products during the last six months of the period of

investigation in the parallel antidumping proceeding, *i.e.*, between April 1, 2003 and

---

[8] According to the questionnaire responses, Nekkanti processed 3,200,000 kilograms of shrimp and 91,000 kilograms of other products between October 1, 2002 and September 30, 2003. *See Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* 2 (July 12, 2004) *in Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y of Commerce* Attach. 1 (Sept. 8, 2004) (Admin. R. Doc. No. 709) ("*Allied Pacific Second Surrogate Value Submission*"). While these figures are ranged, they fall within 10% of the actual amount. *Letter from Garvey Schubert Barer to Sec'y of Commerce* 1 (July 12, 2004) *in Allied Pacific Second Surrogate Value Submission* Attach. 1.

September 30, 2003.  The court therefore concludes that substantial record evidence supports the

finding that the purchasing data in the financial statement pertain only to shrimp and not to other

seafood.  Even if Commerce might have made a different finding with respect to this issue based

on the record evidence, under the substantial evidence standard, "the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence."  *Consolo*, 383 U.S. at 620 (citations omitted).

### 2.  The Department Adjusted the Nekkanti Financial Statement Data Using Data That Were Partly Contemporaneous

Commerce adjusted the Nekkanti financial statement data in the Remand

Redetermination in response to the court's observation, in *Allied Pacific I*, that these data

included purchases of processed shrimp.  *See Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d

at 1311-12.  Commerce now acknowledges the error.  Remand Redetermination 9.  To address

the problem, Commerce adjusted the financial statement data using ranged data provided by

Nekkanti for its purchases of raw and processed shrimp during the parallel antidumping duty

investigation on certain frozen shrimp from India.  *Id*. at 17-18.  Using those data, Commerce

altered its calculation of the surrogate value by reducing the quantity of Nekkanti's raw materials

consumed by 23.99% and the value of those raw materials by 32.14%.  *Id*. at 18.  The adjustment

lowered the base surrogate value from $5.97 per-kilogram to $5.07 per-kilogram.  *Id*.  The court

concludes that Commerce's adjustment to the financial statement is supported by record

evidence.

As an initial matter, the court notes that the parties to this case appear to be under the

impression that there is no temporal overlap between the data from the parallel antidumping

investigation and the Nekkanti financial statement data.  Rather, they seem to assume that the data used to adjust the financial statement data pertain to a time period immediately following Nekkanti's 2002-2003 fiscal year.  Commerce, in the Remand Redetermination, stated that the "downward adjustment to the 2002-2003 Nekkanti shrimp price . . . used data from *the immediately following six month period* to make an adjustment to the 2002-2003 Nekkanti shrimp price."  *Id*. at 67-68 (emphasis added).  Defendant repeats Commerce's statement in its submission to the court.  Def.'s Remand Resp. 12-13.  Both plaintiffs are of the same point of view.  Allied Pacific Comments 12 (stating that "the purchase data for processed shrimp Commerce has used reflects Nekkanti's purchases during the six month POI [*i.e.*, period of investigation], which Commerce has already acknowledged is not contemporaneous with the 2002-2003 Nekkanti fiscal year"); Yelin Comments 7 (stating that Commerce "adjusts Nekkanti's raw material price for the 2003 fiscal year based on Nekkanti's publicly ranged purchase data covering a *different* time period, April through September 2003").

The record contradicts these statements.  The period of investigation for the parallel antidumping duty investigation on frozen shrimp from India was from October 1, 2002 through September 30, 2003, while the fiscal year analyzed in the Nekkanti financial statement began on April 1, 2002 and ended on March 31, 2003.  *See Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd. in Allied Pacific Second Surrogate Value Submission* Attach. 1; *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From India*, 69 Fed. Reg. at 76,916; *Nekkanti Sea Foods Ltd. 19th Annual Report 2002-2003* at 1 *in Petitioners' Surrogate Value Submission* Attach. 1.  The data Commerce used in making the adjustment, *i.e.*,

the data from the parallel antidumping investigation, therefore overlaps the period analyzed by

the Nekkanti financial statement for the time period of October 1, 2002 to March 31, 2003.[9] *See*

*Remand Redetermination* 18 (stating that the "downward adjustment is based on record data

showing Nekkanti's period of investigation purchases of raw materials"); *see also Letter from*

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y of Commerce* 5-6,

Attachs. 1-2 (Dec. 7, 2004) (Admin. R. Doc. No. 825).

It was reasonable for Commerce to use information submitted by Nekkanti as part of the

parallel antidumping investigation to adjust the financial statement data.  The Nekkanti financial

statement and the Indian antidumping investigation data sets both pertain to purchases of shrimp,

processed and unprocessed, made by Nekkanti.  Because of the overlap in the periods covered by

the data sets, Nekkanti's purchases of processed and unprocessed shrimp that occurred between

October 1, 2002 and March 31, 2003 are reflected in both data sets.  While there is no overlap

---

[9] It is not apparent to the court how Commerce could have, as Yelin claims and as the other parties suggest, "adjust[ed] Nekkanti's raw material price for the 2003 fiscal year based on Nekkanti's publicly ranged purchase data covering a *different* time period, April through September 2003." *See* Comments of Yelin Enterprise Co., Hong Kong 7.  The ranged data provided by Nekkanti for its purchases of raw and processed shrimp during the parallel antidumping duty investigation on certain frozen shrimp from India spans the entire period of investigation for that proceeding, *i.e.*, October 1, 2002 through September 30, 2003. *See Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* at 4-5, Ex. SD-3 *in Allied Pacific Second Surrogate Value Submission* Attach. 1; *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From India*, 69 Fed. Reg. 76,916, 76,916 (Dec. 23, 2004). These data are a compilation of all the raw and processed shrimp purchases Nekkanti made during that period of investigation and do not contain information as to the dates on which Nekkanti made those purchases. *Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* at 9, Ex. SD-3 *in Allied Pacific Second Surrogate Value Submission* Attach. 1.  Thus, even if Commerce had desired to use ranged data from the parallel antidumping investigation covering only April through September 2003 to make the adjustment, the limitations of the data set would appear to have precluded it from doing so.

with respect to the remaining portion of the shrimp purchases covered in the two data sets, plaintiffs have pointed to no record evidence that would suggest that the ratio of unprocessed shrimp purchases to processed shrimp purchases that existed during Nekkanti's period of investigation changed significantly from the ratio that occurred in the time period covered by the Nekkanti financial statement.

<u>3.  The Nekkanti Financial Statement Data Are Not Count-Size Specific, and the Department's Method of Estimating Count-Size-Specific Values for Nekkanti Rests in Part on an Unreasonable Inference</u>

In *Allied Pacific I*, the court identified shortcomings in the Department's method of determining count-size specific values from the financial statement data.  *Allied Pacific I*, 435 F. Supp. 2d at 1318-20.  The Remand Redetermination retains the same flawed method, without change.  Remand Redetermination 22-24.

The Nekkanti financial statement does not present data on prices paid for shrimp of any specific count size.  *See Nekkanti Sea Foods Ltd. 19th Annual Report 2002-2003* at 23 *in Petitioners' Surrogate Value Submission* Attach. 1.  In contrast, the Devi and Nekkanti ranged data, the SEAI circulars, and the ACC data pertain, in some way, to purchases of shrimp of a specific count size or range of count sizes.  *See Allied Pacific First Surrogate Value Submission* at Ex. 3; *Allied Pacific Second Surrogate Value Submission* at Ex. 3; *Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* at Ex. SD-3 *in Allied Pacific Second Surrogate Value Submission* Attach. 1; *Supplemental Resp. to Section D of Devi Sea Foods Ltd.* Ex. Supp.D-1-Supp.D-8 (July 13, 2004) *in Allied Pacific Second Surrogate Value Submission* Attach. 2.  Commerce has acknowledged the importance of using count-size-specific prices for the calculation of an accurate surrogate value for unprocessed shrimp.  *Decision Mem.* at 15-16.

In the investigation, Commerce, attempting to compensate for the deficiency in the purchasing data in the financial statement, assigned count-size-specific values to Allied Pacific's and Yelin's purchases of unprocessed shrimp through a complex, six-step calculation using Urner Barry data. *See Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1307-08. With respect to this calculation, the court in *Allied Pacific I* concluded that "Commerce has not provided a sufficient explanation of how the most reliable market average based on the record evidence could result from its complicated method of assigning a count size to the base value of $5.97 per kilogram and deriving other count-size values from that base value." *Id.* at 1318. Citing the potential inaccuracies, the court also stated in *Allied Pacific I* that "the *Final Determination* lacks an adequate explanation of how this method of calculating count-size-specific prices for unprocessed shrimp could have satisfied the Department's obligation to use the best available information." *Id.* at 1320. Despite the court's identification of the shortcomings in the Department's method of determining count-size-specific values, Commerce retained this method in the Remand Redetermination, applying it to the new base value of $5.07 per-kilogram. Remand Redetermination 23-24. Commerce did not discuss in the Remand Redetermination how this method could have satisfied the requirements of the statute.

As it did in the Final Determination, Commerce assigned its base value, as calculated from the financial statement data, to the 31/40 shrimp-per-pound count size range. *Id.* at 23. However, the Nekkanti financial statement contains no information with respect to the count sizes of shrimp purchased by Nekkanti. Lacking such information, Commerce relied on the values derived from its calculation of the weighted average count size for shrimp purchased by Allied Pacific and Yelin to assign the Nekkanti base value to the 31/40 count size range. *See id.*;

*Decision Mem.* at 16; *Mem. from Alex Villanueva, U.S. Dep't of Commerce, to The File* at 2-4

(Nov. 29, 2004) (Admin. R. Doc. No. 810); *Mem. from Alex Villanueva, U.S. Dep't of*

*Commerce, to The File* at 2-4 (Nov. 29, 2004) (Admin. R. Doc. No. 819). As it had in the

investigation, Commerce on remand calculated the surrogate values for count sizes greater and

lesser than 31/40 shrimp per pound by adjusting the Nekkanti base price by 13.24% for

successive count sizes. *See* Remand Redetermination 23-24.

Because Commerce calculated estimated values for Nekkanti's purchases of shrimp in

various count-size ranges based on data on purchases that were not made by Nekkanti (and

instead were made by Allied Pacific and Yelin), these estimated values depend on an implied

inference that the purchases reflected in the Nekkanti financial statement and those of Allied

Pacific and Yelin are comparable with respect to weighted average count size. The court does

not find substantial evidence in the record to support such an inference. Defendant contends,

however, that the lack of count-size-specific information in the Nekkanti financial statement

"does not render [the data] less reliable than plaintiffs' sources." Def.'s Remand Resp. 8.

According to defendant, because "the count sizes reported by Allied Pacific and Yelin would not

directly correspond to the count sizes indicated in the SEAI, [ACC], and Nekkanti/Devi ranged

prices," should Commerce use any of the alternative data sets, "any of these data sources would

have required adjustments *just like those required by Nekkanti [financial statement] data*." *Id.*

(emphasis added). Commerce makes the same argument in the Remand Redetermination.

Remand Redetermination 68. The court does not agree with this argument, which ignores the

record evidence that each of the other data sets is grounded in information that is in some respect

count-size specific.

The Nekkanti and Devi ranged data sets, for example, provide data with respect to the cost and quantity of unprocessed shrimp purchased by the two companies that are specific to nearly every possible count size between 10 and 150 shrimp per kilogram. *See Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* at Ex. SD-3 *in Allied Pacific Second Surrogate Value Submission* Attach. 1; *Supplemental Resp. to Section D of Devi Sea Foods Ltd.* at Ex. Supp.D-1-Supp.D-8 *in Allied Pacific Second Surrogate Value Submission* Attach. 2. Without resorting to the complex methodology employed by Commerce, the Nekkanti and Devi ranged data can be grouped into any number of count size ranges and analyzed so as to correspond to the ranges provided by Allied Pacific and Yelin. *See* Allied Pacific Comments, Attach. 2 at 4-10 (grouping purchases of unprocessed shrimp made by Devi and Nekkanti into the Department's standard count sizes without using the Department's six-step methodology). Although the SEAI and ACC data would require some adjustment to create count-size ranges that correspond to those reported by plaintiffs, such an adjustment would be notably less extensive than the one employed by Commerce in the Remand Redetermination to adjust the financial statement data and would not rely on an unsupported inference regarding the count-size composition of Nekkanti's financial statement shrimp purchases because the SEAI and ACC data already have a relationship to count size. *See Allied Pacific First Surrogate Value Submission* at Ex. 3; *Allied Pacific Second Surrogate Value Submission* at Ex. 3.

In summary, the adjustment Commerce made to the Nekkanti financial statement data for count size ranges is flawed. The flaw in the adjustment method might have been acceptable were no alternate data sets available on the record, or were the alternate data sets also to require such adjustment. Although Commerce expressly concluded in the Remand Redetermination that the

alternate data sets were "less reliable than the adjusted Nekkanti data and using them to value

Allied Pacific['s] and Yelin's raw shrimp inputs would result in a less accurate margin," that

conclusion, for the reasons discussed below, is unsustainable on the record of this case because it

is not based on findings of fact that are supported by substantial evidence. *See* Remand

Redetermination 8-9.

### 4.  The Remand Redetermination Did Not Base Its Choice of the Financial Statement Data on a Fair Comparison of the Various Data Sets

The court stated in *Allied Pacific I* that "selecting the surrogate value data that yield the

most accurate dumping margin necessarily requires Commerce to conduct a *fair comparison* of

the data sets on the record." *Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1313-14 (emphasis

added).  On remand, Commerce failed to do so.

In the Remand Redetermination, Commerce rejected the Devi and Nekkanti ranged data

based on its finding that "the Ranged Data is not the most accurate data set on the record."

Remand Redetermination 32.  As it had in the investigation, Commerce in the Remand

Redetermination pointed to the ranging process as the reason for its conclusion that the Devi and

Nekkanti ranged data are less accurate than the Nekkanti financial statement data. *See id*.

at 32-34; *Decision Mem*. at 13-14.  Commerce stated in the Remand Redetermination as follows:

> Section 351.304(c) of the Department's regulations states that numerical data will
> be considered adequately summarized if grouped or presented in terms of indices
> or figures within ten percent of the actual figure.  In accordance with Section
> 351.304(c) of the Department's regulations [*i.e.*, 19 C.F.R. § 351.304(c)],
> Nekkanti and Devi may have chosen to range hundreds of data points *either*
> upward or downward by as much as ten percent.  Thus, for example, for any
> particular transaction, Nekkanti and Devi may adjust the quantity, value, and
> count size upward or downward by ten percent without any consistency in the
> relationship between the figures.  As a result, the differential between a given
> quantity and its corresponding value can be significant.  Given this possibility, if

the Department were to rely on the Ranged Data, it may be relying on figures that deviate substantially from the actual data by much more than 10 percent.

*Id.* at 32-33.

The Department's findings concerning the potential extent of inaccuracies from ranging are supported by substantial record evidence only with respect to the Nekkanti ranged data and not with respect to the Devi ranged data. The Nekkanti ranged data, unlike the Devi ranged data, do not include a unit price for each count size and are presented in a format indicating that the count sizes are ranged. *See Supplemental Resp. to Section D of Nekkanti Sea Foods Ltd.* at Ex. SD-3 *in Allied Pacific Second Surrogate Value Submission* Attach. 1. The Devi ranged data are comprised of species-specific tables presenting, for each count size, the quantity in kilograms of shrimp purchased, data identifying the type of shrimp purchased (from which it may be ascertained whether a particular purchase was of processed or unprocessed shrimp) and the per-kilogram price. *See Supplemental Resp. to Section D of Devi Sea Foods Ltd.* at Ex. Supp.D-1-Supp.D-8 *in Allied Pacific Second Surrogate Value Submission* Attach. 2. The Devi ranged data, contrary to what Commerce states, do not indicate that the count sizes have been ranged in addition to the per-kilogram prices. *See id*. As Commerce acknowledges, the Devi ranged per-kilogram prices are required by the regulation to fall within ten percent of the actual figure. However, the court does not find support in the record for the Department's finding that these ranged prices may "deviate substantially from the actual data by much more than 10 percent." *See* Remand Redetermination 33. It is not apparent to the court why the ranging of the quantity would cause the per-kilogram Devi ranged prices to vary from the actual

per-kilogram prices by more than ten percent.  In rejecting both data sets, Commerce does not

address the distinctions between the Devi ranged data set and the Nekkanti ranged data set.

The court does not find substantial evidence in the record to support the Department's

finding that the ranging of the Devi data creates inaccuracies greater than those afflicting the

financial statement data, which inaccuracies stem from the Department's reliance, to some

extent, on an unsupported inference rather than record evidence in adjusting for count size.

Additionally, the Devi and Nekkanti ranged data, unlike the financial statement data, are partly

contemporaneous with the period of investigation.

The Department's finding that the SEAI data are less reliable than the Nekkanti financial

statement data is also not supported by substantial record evidence.  As in the investigation, the

Department's primary objection to the SEAI data is that the SEAI prices are not "publicly

available."  *See* Remand Redetermination 24-26; *Decision Mem.* at 15; *Mem. from John D. A.*

*LaRose, U.S. Dep't of Commerce, to The File* at 4 (July 2, 2004) (Admin. R. Doc. No. 529).  The

court discussed at length in *Allied Pacific I* why overemphasizing the "public availability"

criterion does not further the objective of identifying the best available information for

determining surrogate values.  *See Allied Pacific I*, 30 CIT at __, 435 F. Supp. 2d at 1315-17.  As

stated in *Allied Pacific I*, "Commerce must balance the interests of transparency and verifiability

that are served by public availability with other considerations, including the desirability of data

that are as specific as possible to the raw material being valued."  *Id*. at __, 435 F. Supp. 2d

at 1317.  Even if Commerce is correct in viewing the SEAI data as insufficiently "publicly

available," Commerce is not free to ignore the record evidence showing that the SEAI data are

superior to the financial statement data in pertaining directly to unprocessed shrimp, in relating to

specific count sizes, in being contemporaneous with the period of investigation, and in not being

confined to the purchasing experience of a single Indian producer.

The Remand Redetermination concludes that the SEAI data are less reliable than the

financial statement data because "SEAI prices from the Andhra Pradesh region represent raw

shrimp purchase prices for only four days of the period of investigation . . . making this an

incomplete data source" and preventing Commerce from "determin[ing] whether Allied Pacific

and Yelin provided representative prices or whether they 'cherry-picked'" favorable circulars.

*See* Remand Redetermination 26-27.  A comparison of the prices in the four SEAI circulars from

Andhra Pradesh to the prices in the SEAI circular from the Tamil Nadu region, which cover the

entire period of review, reveals that the prices from the Andhra Pradesh circulars are comparable

to those in the Tamil Nadu circular, calling into question the Department's speculation that the

prices in the circulars may have been "cherry picked."  *See Allied Pacific First Surrogate Value*

*Submission* at Ex. 3.

Finally, with respect to the ACC data, in *Allied Pacific I*, the court concluded that

Commerce, in rejecting the ACC data as insufficiently insulated from conflict of interest, failed

to provide an adequate explanation.  The court observed that the explanation given consisted of

little more than a summary of the petitioner's objection.  *Allied Pacific I*, 30 CIT at __, 435

F. Supp. 2d at 1320-21.  In the Remand Redetermination, Commerce included a more detailed

discussion of its reasons for rejecting the ACC data.  On remand, Commerce again identified

insulation from conflict of interest as a reason for rejecting the ACC data, finding that some of

the ACC members were respondents in the parallel Indian investigation and that the ACC prices

were posted only after publication of the Preliminary Determination on June 16, 2004.  Remand

Redetermination 28-31.  Commerce raised a general concern about the reliability and legitimacy of the ACC data, based on a finding that the posting of raw shrimp prices on the ACC website was a one-time event and that ACC was not organized for the purpose of, nor normally engaged in the practice of, posting such prices.  *Id*. at 29-31.

Substantial record evidence supports the findings that the ACC price data were not regularly posted and that posting of such prices was not a routine ACC function.  It is within the Department's discretion to give weight to these two findings in its evaluation of the various data sets.  However, the court considers it unnecessary to decide whether Commerce supported with substantial record evidence its decision to favor the financial statement data over the ACC data.  As discussed previously, the court is unable to affirm Commerce in its finding that the Nekkanti financial statement data constitute the best available information on the record for valuing the raw shrimp input; the court reaches this conclusion in large part due to the availability on the record of the Devi ranged data and the SEAI data.

Based on the foregoing, the court concludes that the record does not contain substantial evidence to support a finding under 19 U.S.C. § 1677b(c)(1) that the Nekkanti financial statement data are the best available information regarding the value of unprocessed shrimp in the surrogate country chosen by the Department.  Therefore, on remand, Commerce may not use the Nekkanti financial statement data to value the raw shrimp input.

5.  The Court Will Deny Plaintiffs' Counter-Motions for Voluntary Remands

In counter-motions for voluntary remands, plaintiffs Allied Pacific and Yelin each seek a remand order directing Commerce either to value the raw shrimp input according to the SEAI data or to provide detailed reasons that essentially would explain why Commerce concludes that

the SEAI data are not the best available information.  *See* Allied Pacific Opp'n to Voluntary

Remand 1-9; Yelin Opp'n to Voluntary Remand 2-4.  The court has determined that Commerce,

in its redetermination in response to this Opinion and Order, may not use the Nekkanti financial

statement data as the basis for the valuation of unprocessed shrimp, as it did in the Remand

Redetermination, because the Department's finding that the Nekkanti financial statement data

constitute the best available information is not supported by substantial evidence on the

administrative record.  If adopted by the court, the proposed orders sought by plaintiffs would

suggest that the court has reached specific conclusions regarding a choice from among the data

sets on the record other than the Nekkanti financial statement data.  The court has not reached

such conclusions.  On remand, Commerce must consider the data on the record (other than the

Nekkanti financial statement data) when determining a new surrogate value for unprocessed

shrimp, support its choice with substantial record evidence, and ensure that its determination

complies with all requirements in the statute and this Opinion and Order.  For these reasons, the

court declines to adopt the approaches in the proposed remand orders advocated by plaintiffs and,

therefore, will deny plaintiffs' counter-motions.

    B.  <u>Commerce's Surrogate Value for Labor Is Not In Accordance with Law because It Was</u>
        <u>Determined According to a Regulation and Methodology that Are Inconsistent with</u>
                          <u>19 U.S.C. § 1677b(c)</u>

     In response to plaintiffs' Rule 56.2 motions, defendant sought a voluntary remand with

respect to Commerce's labor rate determination, acknowledging that "Commerce's calculation of

the labor wage rate may be erroneous and in need of recalculation."  *See Allied Pacific I*, 30 CIT

at __, 435 F. Supp. 2d at 1303 (internal quotation marks and citation omitted).  The court in

*Allied Pacific I* granted defendant's request for a voluntary remand to redetermine the labor rate

but did so subject to court-ordered conditions. *See id*. at __, 435 F. Supp. 2d at 1308-09. The court ordered that Commerce redetermine the surrogate value for a labor rate, and "as required by law, . . . support its findings of fact concerning the redetermined surrogate value for a labor wage rate . . . by citing to specific evidence on the record" and "explain its reasons for the choices it makes from among the various alternatives it considers." *Id*. at __, 435 F. Supp. 2d at 1323. One alternative on the record was to value the labor rate according to the country-wide labor rate, or rates, of one or more countries that Commerce found to be comparable in economic development to China. Plaintiffs advocated the use of India's country-wide rate for this purpose. Br. in Supp. of Allied Pacific's Rule 56.2 Mot. for J. upon the Agency R. 41-45 ("Allied Pacific Br."); Mem. of Yelin Enterprise Co., Hong Kong in Supp. of Its Mot. for J. on the Agency R. 39 ("Yelin Br.").

In its comments on the Remand Redetermination, Allied Pacific opposes the $0.85 per-hour labor rate Commerce determined on remand. Allied Pacific continues to advocate the use of the country-wide wage rate for India (in 2002, $0.21 per-hour) to value labor. Allied Pacific Comments 44-45. Allied Pacific argues that the use of Commerce's regression analysis to value labor "contradicts the statute's language that the factors of production be valued using data from economically comparable countries" and that the Remand Redetermination fails to explain how a regression analysis based on a basket of countries not economically comparable to China comports with that language. Allied Pacific Comments 47-48; *see also* Allied Pacific Br. 43. Seeing in the record no evidence that all the countries used in Commerce's regression analysis were significant producers of certain frozen warmwater shrimp, Allied Pacific also contended in its Rule 56.2 motion that "Commerce's methodology violates the statutes [*sic*] requirements that

surrogate values be taken from countries that are significant producers of comparable merchandise." Allied Pacific Br. 43. Allied Pacific further contends that the Department's methodology overestimates the wage rate for market economies comparable to China's and that the Department has not adequately explained why its regression analysis is more accurate than the country-wide wage rate of India. Allied Pacific Comments 42-45; *see also* Allied Pacific Br. 42-44. Alternatively to using the country-wide wage rate of India, Allied Pacific advocates use of a regression analysis incorporating all available data, should the court conclude that use of a regression analysis is lawful. Allied Pacific Comments 45-49; *see also* Allied Pacific Br. 46-48.

Yelin also opposes the $0.85 per-hour labor rate, pointing out that "[i]n their briefs, plaintiffs have identified the numerous fundamental errors in the Department's labor rate calculation." Yelin Comments 25. Yelin argues that the Remand Redetermination corrected only minor errors and joins in Allied Pacific's arguments. *Id*. Commenting on the Remand Redetermination, Yelin argues generally that the court should order Commerce to recalculate the labor rate according to the holding in *Dorbest Ltd. v. United States*, 30 CIT __, 462 F. Supp. 2d 1262, 1292-94 (2006) (*"Dorbest I"*), which also reviewed, and found contrary to law, the surrogate labor rate at issue in this litigation. Yelin Opp'n to Voluntary Remand 4.

Defendant contends that the Department's redetermined regression-based labor rate and the regulation upon which it is based, 19 C.F.R. § 351.408(c)(3), are permissible under the antidumping statute. Def.'s Remand Resp. 44-45; 49-52. According to defendant, Commerce properly rejected the country-wide wage rate of India because using that rate is not required by statute and would violate 19 C.F.R. § 351.408(c)(2)-(3). *Id*. at 52-54 (citing Remand

Redetermination 74). Defendant also argues that Commerce provided an adequate explanation in the Remand Redetermination for its rejection of plaintiffs' two preferred alternatives. *Id*. at 45.

For several reasons, the court construes plaintiffs' claim that the Department's "regression analysis" methodology does not comport with the statute as a challenge both to the methodology and to the Departments' regulation, 19 C.F.R. § 351.408(c)(3), which requires an annual regression analysis using country-wide labor rates. First, the primary relief that plaintiffs request in their Rule 56.2 motions and in their comments on the remand results, adoption of the India-wide labor rate as the surrogate labor rate in this proceeding, would require invalidation of the Department's regulation. Plaintiffs appear to acknowledge, in support of their Rule 56.2 motions, that the regulation must be invalidated in order for them to obtain this relief, stating that "Commerce argues that its regulations required the use of this calculated wage rate, but the validity of this regulation is questionable." Allied Pacific Br. 42 (adopted by Yelin at Yelin Br. 39). Second, in contending that the statute requires labor to be valued using data from market economy countries that are at a level of economic development comparable to China and are significant producers of merchandise comparable to the subject merchandise, plaintiffs are arguing specifically that Commerce's methodology violates 19 U.S.C. § 1677b(c)(4). As discussed later in this opinion, the regulation requiring that methodology, 19 C.F.R. § 351.408(c)(3), does not permit Commerce to comply with § 1677b(c)(4). An agency is bound by its own regulations. *Torrington Co. v. United States*, 82 F. 3d 1039, 1049 (Fed. Cir. 1996). Only by deciding the issue of the validity of 19 C.F.R. § 351.408(c)(3) may the court rule on the statutory construction issue that plaintiffs have raised. Finally, although plaintiffs use the word "questionable" in pursuing their claim with respect to the validity of the regulation, the claim,

and the relief they sought, directed the court to the issue of whether the regulation is permissible

under the statute and sufficed to place defendant on notice of the need to include a justification

for why defendant believes the regulation is lawful.  Commerce has included such a justification

in the Remand Redetermination.[10]  The court concludes that plaintiffs' claim and supporting

arguments, construed as a whole, squarely place the issue of the validity of the regulation before

the court.  The court discusses below the reasons for its conclusion that both the methodology

Commerce used to develop the $0.85 per hour surrogate labor rate and the regulation under

which that methodology was applied are inconsistent with the governing statute.

Plaintiffs' principal argument is that Commerce's methodology, in valuing labor,

"contradicts the statute's language that the factors of production be valued using data from

economically comparable countries" and countries that are significant producers of merchandise

comparable to the subject merchandise.  *See* Allied Pacific Comments 47-48; Allied Pacific

Br. 43; Yelin Comments 39.  Plaintiffs base this argument on 19 U.S.C. § 1677b(c)(4), which

provides that Commerce, when valuing factors of production:

> shall utilize, to the extent possible, the prices or costs of factors of production in
> one or more market economy countries that are – (A) at a level of economic
> development comparable to that of the nonmarket economy country, and
> (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4).

If Commerce determines (as it has generally) that it is unable, using the available

information, to determine the normal value of subject merchandise exported from China

---

[10] The Department stated in the Remand Redetermination that plaintiffs, in their
Rule 56.2 motions, "contended, in essence, that the regulation that the Department followed in
this case (19 C.F.R. [§] 351.408(c)(3)) was of questionable validity."  Remand Redetermination
at 74.

according to the general provisions of 19 U.S.C. § 1677b(a), Commerce, as required by

§ 1677b(c), "shall determine the normal value of the subject merchandise on the basis of the

value of the factors of production utilized in producing the merchandise," adding an amount for

general expenses and profit plus the cost of containers, coverings, and other expenses. *Id.*

§ 1677b(c)(1). The factors of production include "(A) *hours of labor required*, (B) quantities of

raw materials employed, (C) amounts of energy and other utilities consumed, and

(D) representative capital cost, including depreciation." *Id.* § 1677b(c)(3) (emphasis added).[11]

Commerce must base its valuation of factors of production, including the required hours of labor,

on the "best available information regarding the values of such factors" in one or more market

economy countries that Commerce considers appropriate. *Id.* § 1677b(c)(1). In summary,

Commerce is to value the required labor hours according to the best available information in a

market-economy country or countries it considers appropriate, but in selecting the best available

information and in valuing the required labor hours, Commerce must utilize, to the extent

possible, labor costs in a country or countries that are comparable to China in economic

development and that are significant producers of merchandise comparable to the subject

merchandise.

Under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44

(1984), deference is granted to a regulation that an agency bases on its own construction of a

statute it is charged to administer. Under *Chevron*, the court first considers whether Congress

---

[11] The statute contains an exception for instances in which Commerce finds that the available information is inadequate for determining normal value according to the factors of production. *See* 19 U.S.C. § 1677b(c)(2) (2000). Commerce made no such finding in this investigation.

has spoken directly to the precise question at issue. *Chevron*, 467 U.S. at 842. If Congress has

not done so, the court next considers whether the agency's construction of the statute is

reasonable. *Chevron*, 467 U.S. at 843. *Chevron* deference also has been held to apply to

Commerce's choice of a methodology. *See Micron Tech., Inc. v. United States*, 117 F.3d 1386,

1394-95 (Fed. Cir. 1997); *Lasko*, 43 F.3d at 1446.

In 19 U.S.C. § 1677b(c)(4), Congress has spoken directly to the method by which

Commerce is to value factors of production, including the hours of labor required to produce the

subject merchandise. The provision does not require Commerce to value the hours of required

labor entirely, or even principally, according to the cost or costs of labor in countries described in

19 U.S.C. § 1677b(c)(4). Nevertheless, the statute provides that Commerce "shall utilize, *to the*

*extent possible*," such prices or costs. 19 U.S.C. § 1677b(c)(4) (emphasis added). The words

"shall utilize, to the extent possible" in § 1677b(c)(4) speak to how Congress intended for

Commerce to value labor and other factors of production and must be given effect in any

plausible construction of § 1677b(c). It is a court's duty "to give effect, if possible, to every

clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting

*Montclair v. Ramsdell*, 107 U.S. 147, 152 (1882)) (internal quotation marks omitted).

The Court of International Trade previously has questioned whether 19 C.F.R.

§ 351.408(c)(3) is consistent with the antidumping statute and, in particular, whether it satisfies

the first criterion in § 1677b(c)(4), the "economic comparability" criterion. *Zhejiang Native*

*Produce & Animal By-Products Imp. & Exp. Group Corp. v. United States*, 32 CIT __, Slip Op.

08-68 (June 16, 2008) ("*Zhejiang*"). As this Court then observed, "Commerce's argument seems

to refer to the validity of using data from a wide range of market economy countries within the

regression model, but does not explain how its regulations, which rely on per capita GNI, rather than surrogate data from market economy countries at a level of development comparable to that of the nonmarket economy, meet the requirements of the antidumping statute." *Id.* at __, Slip Op. 08-68 at 36. In *Zhejiang*, this Court directed Commerce to explain on remand why it believes 19 C.F.R. § 351.408(c)(3) is consistent with the statutory requirements. *Id.* at __, Slip Op. 08-68 at 37 ("Because Commerce has failed to explain how its regulations comport with the statute, this matter is remanded for the Department to supply that explanation."). The opinion in *Zhejiang* indicates that plaintiffs based their primary challenge to the Departments' labor rate on the first criterion in § 1677b(c)(4), arguing that the Department's labor rate calculation contradicts the statutory language that the factors of production be valued using data from economically comparable countries. *Id*. at __, Slip Op. 08-68 at 34-35.

The Court of International Trade also considered challenges to 19 C.F.R. § 351.408(c)(3), and the Department's methodology thereunder, in *Dorbest I* and *Dorbest Ltd. v. United States*, 32 CIT __, 547 F. Supp. 2d 1321, 1324-30 (2008) ("*Dorbest II*"). *Dorbest I* rejected a facial challenge to the regulation, observing that the regulation is "silent as to how Commerce will select market economies for its data set" and that "Commerce could conceivably be faithful to both its regulation and Respondents' interpretation of the antidumping statute by using data from only comparable market economies." *Dorbest I*, 30 CIT __, 462 F. Supp. 2d at 1292.[12]

---

[12] *Dorbest Ltd. v. United States*, 30 CIT __, 462 F. Supp. 2d 1262, 1293 (2006) (*"Dorbest I"*) also considered an "as applied" challenge to the regulation, in support of which respondents had argued that most of the countries in Commerce's data set have a level of economic development far exceeding that of the PRC. *Dorbest I* rejected the "as applied" challenge, concluding that Commerce's surrogate wage rate calculation method, "at least in theory, produces a hypothetical wage rate for the PRC, which is therefore by definition a wage

(continued...)

*Dorbest II* held that the surrogate labor rate Commerce determined on remand from *Dorbest I* following a notice-and-comment rulemaking regarding data selection and methodology, was in accordance with law.[13] *Dorbest II*, 32 CIT at __, 547 F. Supp. 2d at 1325 & n.6.

Neither the *Zhejiang* opinion nor the opinions in the *Dorbest* cases discussed the precise statutory construction issue that plaintiffs have raised in this case. That issue is whether Commerce, in determining the surrogate labor rate according to its regulation and its methodology, has satisfied both the first and the second criterion stated in § 1677b(c)(4), *i.e.*, both the "economic comparability" criterion and the "significant producer" criterion. Congress's use of the conjunctive in § 1677b(c)(4)(A) to join the two criteria signifies congressional intent that, to the extent possible, Commerce must use prices or costs that satisfy the two criteria simultaneously. Congress could have, but did not, choose language directing Commerce to satisfy, to the extent possible, only one or the other of the two criteria. Commerce must use, "to the extent possible," prices or costs from a market economy country or countries that satisfy *both* criteria.

---

[12](...continued)
rate for a producer country at a comparable level of economic development, as required by 19 U.S.C. § 1677b(c)(4)." *Dorbest I*, 30 CIT at __, 462 F. Supp. 2d at 1293. Aside from the challenges to the regulation, *Dorbest I* also rejected, on arbitrariness and substantial evidence grounds, Commerce's use of a data set that excluded countries meeting Commerce's own standards for inclusion. *Id.* at __, 462 F. Supp. 2d at 1295.

[13] Commerce, on remand, included all data that met its suitability requirements and that were available at the time the 2004 wage rate was calculated, resulting in a surrogate wage rate that was lowered to $0.77 per hour from $0.85 per hour. *Dorbest Ltd. v. United States*, 32 CIT __, 547 F. Supp. 2d 1321 (2008) ("*Dorbest II*") affirmed the choice-of-countries aspect of Commerce's remand redetermination, which was not challenged by any of the parties. *Dorbest II*, 32 CIT at __, 547 F. Supp. 2d at 1325 & n.6.

The legislative history of the provision confirms the importance Congress attached to the use of data on prices or costs from countries satisfying both criteria in § 1677b(c)(4). The provision was enacted in essentially its current form by § 1316 of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107, 1186-88. Concerning § 1316, the report of the Conference Committee ("Conference Report") explains that "[t]he factors [of production] would be valued from the best available evidence in a market economy country (or countries) that is at a comparable level of economic development as the country subject to investigation *and* is a producer of the comparable merchandise." H. Conf. Rep. No. 100-576 at 590 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1623 (emphasis added).

Although it might be argued that the labor cost information from the fifty-four countries that Commerce chose for its regression analysis would include some information from countries that satisfy both criteria in 19 U.S.C. § 1677b(c)(4), such incidental use does not satisfy the statutory directive to use § 1677b(c)(4) labor costs "to the extent possible."[14] In neither the subject antidumping duty investigation, nor the Remand Redetermination, did Commerce base its labor rate on a finding as to which market economy country or countries satisfy both criteria in § 1677b(c)(4) (although, based on its other findings and the evidence of record, India, if not other countries, would appear to qualify). Nor did Commerce base the labor rate on a finding as to

---

[14] Commerce did not state, either in the final determination or in the accompanying decision memorandum, that it selected the fifty-six countries for use in its regression analysis based on the economic comparability criterion, although theoretically it would have been possible for the Department to limit its regression analysis entirely, or principally, to countries satisfying the economic comparability criterion. *See Dorbest I*, 30 CIT at __, 462 F. Supp. 2d at 1291. Commerce did not determine the level of economic development of the vast majority of these countries to be at a level comparable to China's; moreover, the Remand Redetermination does not explain how Commerce's methodology also could satisfy the second of the § 1677b(c)(4) criteria.

whether any specific labor cost information from § 1677b(c)(4) countries should be considered

for purposes of selecting the "best available information" as required by 19 U.S.C. § 1677b(c)(1),

and 19 C.F.R. § 351.408(c) would have made any such finding irrelevant.  Yet, under a

regulatory procedure that precludes the Secretary of Commerce from applying such findings as

these in a particular antidumping duty investigation, compliance with 19 U.S.C. § 1677b(c)(4) is

not possible.  Commerce cannot endeavor to use in an antidumping duty investigation, "to the

extent possible," labor cost information described by § 1677b(c)(4) if it is confined to an annual

procedure that, for purposes of a specific antidumping duty investigation, disregards whether

such information exists and attaches no importance to identifying the countries that are

significant producers of the subject merchandise.  The regulation orders the Secretary of

Commerce to "calculate the wage *rate* to be applied in nonmarket economy *proceedings each*

*year*."  19 C.F.R. § 351.408(c)(3) (emphasis added).  The regulation requires a single calculated

wage rate to be determined annually and to be applied to multiple nonmarket economy

"proceedings," *i.e.*, investigations and reviews.  The regulation does not permit a surrogate labor

rate to be determined for an individual proceeding and thereby precludes consideration of any

investigation-specific information.  Under the regulation, the annual labor rate determination is

made without regard to the merchandise that is the subject of the investigation, even though the

second criterion in 19 U.S.C. § 1677b(c)(4) is expressly directed to merchandise comparable to

the subject merchandise.  *See* 19 U.S.C. § 1677b(c)(4)(B); 19 C.F.R. § 351.408(c)(3).

In summary, Congress identified in § 1677b(c)(4) a specific type of information that the

Secretary of Commerce is required to use in an antidumping duty investigation, to the extent

possible, in valuing the cost of the labor used to produce the merchandise that is the subject of

that investigation.  In making the determination of whether, and to what extent, it is possible to

use that information, Commerce must be guided by the principle expressed in § 1677b(c)(1),

which is to use the "best available information" from a market economy country or countries that

Commerce chooses.  The procedure required by 19 C.F.R. § 351.408(c)(3) pays no heed to

§ 1677b(c)(4), the second criterion of which is investigation-specific, and does not permit the

Secretary to determine the best available labor cost information with respect to the particular

investigation being conducted.  The procedure the regulation requires is not the one Congress

directed the Secretary to follow.  The regulation, therefore, does not survive judicial scrutiny

under the first part of the test in *Chevron.*  As the Supreme Court stated, "[i]f the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43

(footnote omitted).

Even if the words "to the extent possible" in 19 U.S.C. § 1677b(c)(4) were viewed as

sufficiently ambiguous to require an analysis according to the second part of the *Chevron*

analysis, the court still could not conclude that the construction of the statute underlying

19 C.F.R. § 351.408(c)(3) is reasonable.  The regulation does not comport with the statute's

intent, which is to value the labor used to produce the subject merchandise according to "the best

available information" in a market economy country or countries, as required by 19 U.S.C.

§ 1677b(c)(1), and, specifically, to use § 1677b(c)(4) information to the extent it is possible to do

so.

Under § 1677b(c)(1) and (3), Commerce is to value the labor that is required to produce

the actual merchandise that is the subject of the investigation.  *See* 19 U.S.C. §§ 1677b(c)(1)

(requiring Commerce to determine normal value "on the basis of the value of the factors of

production *utilized in producing the merchandise*" (emphasis added)) & 1677b(c)(3) (stating that

"[f]or purposes of [§ 1677b(c)(1)], the factors of production *utilized in producing merchandise*

include . . . hours of labor required" (emphasis added)).  Rather than speaking in terms of

Commerce's setting a general labor rate for an entire nonmarket economy country that is not

related to any specific good or service, the statute establishes a relationship between the valuation

of each factor of production, including labor, and the production of the subject merchandise

itself.

Legislative history supports the principle that Congress intended Commerce to use, where

possible, information on the cost of the specific labor used to produce the subject merchandise.

Addressing generally the valuation of factors of production, the Conference Report states that

"Commerce should seek to use, if possible, data based on production of the same general class or

kind of merchandise using similar levels of technology and at similar levels of volume as the

producers subject to investigation."  H.R. Conf. Rep. No. 100-576 at 591, *as reprinted in*

1988 U.S.C.C.A.N. at 1624.  The stated principle makes no exception for the valuation of the

cost of the required hours of labor.

Although the Remand Redetermination provides an explanation of why the Department

considers the regulation, and the method applied thereunder, to be consistent with the statute, it

does not address the question of why it is permissible for the Department's regulation to defeat

the objective of valuing, where possible based on available information, the specific labor used to

produce comparable merchandise.  *See* Remand Redetermination 74-80.  A discussion of the

issue, however, is contained in the preamble accompanying the general revision of the

antidumping and countervailing duty regulations that promulgated the current 19 C.F.R.

§ 351.408(c)(3). During the rulemaking procedure, Commerce received comments criticizing the

regression analysis method on the grounds that the method failed to recognize different wage

levels for skilled and unskilled labor and because it did not use industry-specific data. *See*

*Antidumping Duties; Contervailing Duties*, 62 Fed. Reg. 27,296, 27,367 (May 19, 1997). In the

preamble to the regulations, the Department responded to this criticism by stating:

> We agree with the first commenter that the regression-based calculation fails to
> provide differentiated wage rates for skilled and unskilled labor. However, this
> results from limitations on the available data, not from the proposed approach.
> Even using a single country as a surrogate, it has been rare for the Department to
> find different wage rates for skilled and unskilled labor. Limitations on available
> data also prevent us from considering whether we should be using full labor costs
> or industry-specific wages, as suggested by the second commenter.

*Id*. Commerce's response in the preamble falls short of a plausible explanation of why

Commerce considered it acceptable to foreclose consideration of data specific to the type of labor

required to produce comparable merchandise. Even were the court to accept at face value the

rationale that data on a specific type of labor are "rare," that rationale still would be insufficient

to justify a regulation that disallows the use of data on the cost of a specific type of labor in those

instances, however rare, in which such data actually exist. The regulation deters a respondent

from seeking, and placing on the record, industry-specific data on labor costs by precluding any

use of that information by the Secretary.

A straightforward example will suffice to illustrate the problem posed by the narrowness

of 19 C.F.R. § 351.408(c)(3). It is at least conceivable that a party to a proceeding might obtain,

from one or more countries that are economically comparable to China and are significant

producers of merchandise comparable to the subject merchandise, information on wage rates in

the specific industry that produces the comparable merchandise or on wage rates for the specific

type of labor used. Such information would seem to be ideal, according to the statutory criteria

of 19 U.S.C. §1677b(c)(1) and (c)(4), for the purpose of valuing the hours of labor required to

produce the subject merchandise. Here again, rather than treat this information as the "best

available information" from a market economy country or countries, the Department's regulation,

paradoxically, would disallow any consideration of the information and dissuade any party from

even bothering to identify or submit it. Under the regulation, once the Secretary of Commerce

has determined a general surrogate wage rate for China under its annual regression analysis, no

exceptions are permitted. *See* 19 C.F.R. § 351.408(c)(3). Thus, in the investigation at issue,

information on the cost of labor in the industry producing frozen shrimp, or a product

comparable to frozen shrimp, in a country that is economically comparable to China and a

significant shrimp producer (such as India), would not have been considered in the determination

of the surrogate labor rate. Adherence to the requirement in 19 U.S.C. § 1677b(c)(1) to select the

"best available information" regarding values of factors of production in market economy

countries is frustrated by a regulation that does not allow Commerce to consider data that could

serve as an alternative to the result of the regression analysis required by § 351.408(c)(3) and

that, additionally, might be specific to the type of labor required to produce comparable

merchandise.

The Remand Redetermination explains that Commerce relied on its wide discretion and

summarily asserts that the methodology Commerce used "is in accord with 19 U.S.C.

§ 1677b(c)(4)." Remand Redetermination at 77. It further states that "[a] relatively broad data

set helps to prevent bias and ensure that the regression is statistically sound," *id.* at 79, and that

"[t]he Department's broader data pool provides a more accurate and predictable determination based upon the regression analysis of income and wages," *id.* at 80. The Department's concern with statistical soundness does not justify dispensing with the statutory purposes of valuing the actual labor used to produce the subject merchandise according to the best available information from market economy countries and to use, to the extent possible, information from countries meeting both § 1677b(c)(4) criteria. The barriers to the use of labor cost information potentially superior to the product of the regression analysis are of Commerce's own making. It is the Department's regulation, not the statute, that requires a regression analysis, that limits the analysis to country-wide labor rates, that requires an annual determination of a surrogate labor rate rather than one grounded in information related to the specific investigation (and therefore to merchandise comparable to the subject merchandise), and that precludes any meaningful consideration or use of information satisfying § 1677b(c)(4).

In the Remand Redetermination, Commerce submits that 19 C.F.R. § 351.408(c)(3), under *Chevron* principles of deference, must be upheld as a reasonable construction of the statute. *Id*. at 75. Commerce views the statute, which requires use of "best available information" without defining the term, to provide sufficiently wide discretion in the valuation of factors of production to justify its regulatory approach to valuing labor. Commerce cites in support of its conclusions *Nation Ford*, 166 F.3d at 1377, *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1372 (Fed. Cir. 1999) ("*MagCorp*"), and *Shakeproof Assembly Components, Div. of Illinois Toolworks, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ("*Shakeproof*"). *Id*. The Remand Redetermination also states that "the statutory term 'best available information' is at best an ambiguous term" and relies for this point on *China National*

*Machinery Import & Export Corp. v. United States*, 27 CIT 255, 263, 264 F. Supp. 2d 1229,

1236-37 (2003) ("*China National*"). *Id*. Therefore, according to the Department, the statutory

interpretations of this phrase articulated by the agency are entitled to judicial deference, and the

court must uphold an agency's reasonable constructions of the statute. *Id*. (citing *China*

*National*, 27 CIT at 263, 264 F. Supp. 2d at 1236; *Pesquera Mares Australes Ltda. v. United*

*States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034,

1038 (Fed. Cir.1996)).

     Although recognizing the breadth of discretion granted to Commerce to choose the best

available market economy information with which to value a factor of production, the holdings in

*Nation Ford* and *Shakeproof* do not support a conclusion that 19 C.F.R. § 351.408(c)(3) must be

upheld as an application of that discretion. In *Nation Ford*, the Court of Appeals for the Federal

Circuit ("Court of Appeals") rejected a challenge to Commerce's choice of a surrogate value for

aniline, a raw material used in the production of the merchandise that was the subject of an

administrative review of an antidumping duty order, sulfanilic acid from China. *Nation Ford*,

166 F.3d at 1377-79. To value aniline, which Chinese producers obtained domestically in China,

Commerce used import values from Indian import statistics rather than domestic prices in India

for aniline, which Commerce found to be greatly distorted by an 85% tariff. *Id*. at 1375-76.

Plaintiff-appellant Nation Ford Chemical Company, the sole U.S. producer of sulfanilic acid,

argued that Commerce acted contrary to law in choosing the Indian import data as a surrogate

value rather than domestic prices for the good in India. *Id*. at 1376-77. Plaintiff-appellant argued

that the choice of the Indian import data over the domestic prices violated 19 U.S.C.

§ 1677b(c)(1). *Id*. Noting the flexibility of Commerce under 19 U.S.C. § 1677b(c)(1) to value

factors of production on the basis of the best available information regarding the values of such factors in a market economy country, the Court of Appeals concluded that plaintiff-appellant "is incorrect that § 1677b(c) 'mandates' that Commerce use a surrogate country's domestic price if the [nonmarket economy] country procures the valued material domestically." *Id*. at 1377. The Court concluded that substantial evidence supported Commerce's conclusion that, under the circumstances, the Indian import prices constituted the best available information bearing on the price of aniline in a hypothetical free-market China. *Id*. at 1378-79. *Nation Ford* does not indicate that it is permissible under the statute for Commerce to promulgate a regulation under which labor must be valued according to information on country-wide labor rates and according to an annual procedure that does not allow consideration of potentially superior information from countries described in 19 U.S.C. § 1677b(c)(4).

*Shakeproof* involved the question of whether Commerce was authorized under 19 U.S.C. § 1677b(c) to value steel wire rod used to produce helical steel spring lock washers according to the price actually paid by the Chinese producer for imports of steel wire rod from the United Kingdom, where the imports were 34.7% of the total used and the remaining 65.3% of the required steel wire rod was obtained from seven Chinese suppliers. *Shakeproof*, 268 F.3d at 1378-81. In holding that it was permissible under the statute for Commerce to use the price of the imported product to value all the steel wire rod, the Court of Appeals relied in part on *Lasko*, in which it had upheld Commerce's valuing manufacturing supplies used in the production of certain fans in China based on the actual prices for these supplies on the international market. *Id*. at 1381-82; *Lasko*, 43 F.3d at 1446. Sustaining Commerce's finding that the best available information on what the supplies would cost in a market economy country was the price charged

for those supplies on the international market, the Court of Appeals concluded that Commerce was not required by the statute to use surrogate values instead. *Lasko*, 43 F.3d at 1446.

The issues presented in *Lasko* and *Shakeproof* are not directly on point in this case, which does not present a question involving an alternative to surrogate values. Labor hours cannot feasibly be valued under the statute in the way that the internationally-traded materials used as manufacturing inputs were valued in those cases. Neither *Lasko* nor *Shakeproof* holds or suggests that Commerce may adopt a methodology, by regulation or otherwise, under which Commerce cannot consider labor costs in one or more surrogate countries that potentially are better information than the country-wide labor cost information that the regulation, and methodology implementing it, requires Commerce to use. "In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof*, 268 F.3d at 1382.

Nor is the issue decided in *China National* analogous to the issue presented by 19 C.F.R. § 351.408(c)(3) and the methodology required thereunder. In *China National*, the Court of International Trade rejected plaintiff's argument that the statute, as construed in *Lasko*, required the Department to employ actual prices paid by a nonmarket economy producer to a market economy supplier over surrogate values in every situation. *China National*, 27 CIT at 264, 264 F. Supp. 2d at 1237. "In *Lasko*, Commerce won the right to use market prices instead of surrogate values for factors of production in [normal value] calculations on the rationale that 'accuracy, fairness, and predictability are enhanced by using those prices.'" *Id*. (citing *Lasko*, 43 F.3d at 1446).

Finally, *MagCorp* does not support a conclusion that 19 C.F.R. § 351.408(c)(3) should be upheld. In the portion of the opinion to which Commerce cited in the Remand Redetermination, the Court of Appeals affirmed Commerce's finding that it was reasonable to use the price in Brazil (Commerce's chosen surrogate country) for raw dolomite as a surrogate value for processed, concentrated carnallite used in producing the subject merchandise, magnesium, in Russia because the two inputs were comparable merchandise. *MagCorp*, 166 F.3d at 1372-73. The issue decided was not analogous to any issue presented by this case.

The court concludes that 19 C.F.R. § 351.408(c)(3) is contrary to 19 U.S.C. § 1677b(c) and therefore invalid. In the Remand Redetermination, Commerce determined the surrogate labor rate of $0.85 per hour according to 19 C.F.R. § 351.408(c)(3) and, as a result, was confined to a methodology that does not comply with the statute. On remand, Commerce must redetermine the surrogate labor rate according to the requirements of the statute and not the requirements of the invalidated regulation.

The remaining question is whether, in redetermining the labor rate, Commerce should confine its surrogate labor rate determination to the evidence of record relevant to the labor rate, which consists largely, if not entirely, of country-wide labor rates for various countries, including India. This case presents the unusual circumstance of an investigation that was conducted under, and unduly limited by, an unlawful regulation. The unlawful regulation did not allow Commerce to consider information that may be superior to the result of the Department's regression analysis and may have constituted the best available information for purposes of 19 U.S.C. § 1677b(c)(1). The regulation also may have dissuaded parties from placing on the record investigation-specific information related to the cost of labor used to produce merchandise comparable to the subject

merchandise in countries described by 19 U.S.C. § 1677b(c)(4). The court is directing

Commerce to allow the record to be reopened for the limited purpose of collecting, and inviting

submission of, new information related to determination of a surrogate labor rate. In this way,

parties will have the opportunity to obtain and submit information that the regulation would have

precluded from consideration. Commerce, in the remand redetermination, must base its new

surrogate labor rate on findings of fact that are supported by substantial evidence.

### C. Allied Pacific Lacks Standing to Contest the Section A Rate

Allied Pacific "request[s] that the Court instruct Commerce to re-calculate the 'Section

A' rate applicable to the non-mandatory respondents based on the final rates affirmed by the

Court." Allied Pacific Comments 49. Allied Pacific bases this request on the fact that "[t]he

Department's Remand has recalculated the dumping margins for Allied Pacific and the Yelin

Group, two of the mandatory respondents, but it has failed to make any corresponding revision to

the 'Section A' rate." *Id*. The separate rate calculated by Commerce for Section A respondents

is based on the weighted average dumping margins of the mandatory respondents. *See Final

Determination*, 69 Fed. Reg. at 71,001; *Notice of Preliminary Determination of Sales at Less

Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances and

Postponement of Final Determination: Certain Frozen and Canned Warmwater Shrimp From

the People's Republic of China*, 69 Fed. Reg. 42,654, 42,662 (July 16, 2004). Defendant argues

that Allied Pacific "has no standing" as "[i]t is not a Section A respondent, and it has never

alleged any injury from the determination of Section A respondents' rate." Def.'s Remand

Resp. 57.

To have standing, plaintiffs must demonstrate: (1) an injury in fact; (2) causation between the injury and the conduct being complained of; and (3) a likelihood that the injury can be redressed. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Allied Pacific has not alleged any injury to itself resulting from the failure of Commerce to recalculate the Section A rate and, specifically, has not shown how that rate will affect the assessment of duties on Allied Pacific's imports of subject merchandise. Allied Pacific therefore lacks standing to challenge the Department's action with respect to that rate.[15] *See Torrington Co. v. United States*, 21 CIT 251, 262-63, 960 F. Supp. 339, 349 (1997) (holding that plaintiff, a company entitled to a company-specific rate, lacked constitutional standing to challenge the "all others" rate because the "all others" rate had no applicability to plaintiff's entries); *FAG Italia S.p.A. v. United States*, 20 CIT 1377, 1383-84, 948 F. Supp. 67, 73 (1996) (same).

### III. CONCLUSIONS

The Department's determination of the surrogate value for raw, head-on, shell-on shrimp in the Remand Redetermination does not comply with the court's decision in *Allied Pacific I*. The Department's finding that the data in the Nekkanti financial statement constitutes the best available information is not supported by substantial evidence on the record of this proceeding. On remand, Commerce must redetermine the surrogate value for raw, head-on, shell-on shrimp according to information other than Nekkanti financial statement data. The redetermined

---

[15] The court does not hold that Commerce, on remand, is precluded from voluntarily recalculating the Section A rate, in accordance with its usual procedures under which the Section A rate is determined according to the weighted average dumping margins of the mandatory respondents.

surrogate value for the unprocessed shrimp must be based on the best available information on the record, and Commerce's findings must be supported by substantial record evidence.

The Department's regulation governing determination of surrogate labor rates in nonmarket economy investigations and reviews, 19 C.F.R. § 351.408(c)(3), is inconsistent with 19 U.S.C. § 1677b(c) and is hereby declared to be invalid. The Department's methodology is also contrary to § 1677b(c). The surrogate labor rate of $0.85 cents per hour that the Department included in the Remand Redetermination was determined according to a regulation and a methodology that do not satisfy the statutory requirements. On remand, Commerce must redetermine the surrogate labor rate without regard to the invalidated regulation and according to a methodology that satisfies the requirements of the statute.

## ORDER

For the reasons stated in this Opinion and Order, plaintiffs' motion for judgment on the agency record is granted, and it is hereby

**ORDERED** that the Remand Redetermination is remanded to Commerce for further proceedings consistent with the requirements of this Opinion and Order; it is further

**ORDERED** that defendant's request for a voluntary remand on the issue of the surrogate value for raw, head-on, shell-on shrimp is DENIED; it is further

**ORDERED** that the counter-motion for remand filed by plaintiff Allied Pacific and the counter-motion for remand filed by plaintiff Yelin are DENIED; it is further

**ORDERED** that Commerce shall file a remand redetermination in which Commerce, in accordance with the requirements of this Opinion and Order, redetermines the surrogate value for raw, head-on, shell-on shrimp, bases the new surrogate value on findings of fact that are supported by substantial evidence on the record, and explains its reasons for the choices it makes from among the various alternatives it considers; it is further

**ORDERED** that Commerce, on remand, must derive a surrogate value for raw, head-on, shell-on shrimp using data on the record other than the Nekkanti financial statement data on which it previously relied; it is further

**ORDERED** that the Department shall redetermine its surrogate value for labor in accordance with the requirements of 19 U.S.C. § 1677b(c) and in accordance with this Opinion and Order and shall do so without regard to 19 C.F.R. § 351.408(c)(3), which the court determines to be contrary to 19 U.S.C. § 1677b(c) and therefore invalid; it is further

**ORDERED** that Commerce, in the remand redetermination, must base its new surrogate labor rate on findings of fact that are supported by substantial evidence; it is further

**ORDERED** that Commerce must reopen the administrative record of this proceeding for the purpose of collecting, and inviting submission of, new information related to the redetermination of the surrogate labor rate; it is further

**ORDERED** that plaintiff Allied Pacific's request that the court instruct Commerce to recalculate the Section A respondents separate rate is DENIED; and it is further

**ORDERED** that Commerce shall have 120 days from the date of this Opinion and Order to complete and file its remand redetermination; plaintiffs shall have 30 days from that filing to file comments; and Commerce shall have 30 days after plaintiffs' comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: December 22, 2008
New York, New York